## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CRAIG L. ELLIS,                          )
                                         )
             Plaintiff,                  )
                                         )
vs.                                      )    Case No. 4:07CV1031 AGF
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of Social Security,         )
                                         )
             Defendant.                  )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Craig Ellis was not entitled to

Supplemental Social Security Income and Social Security Disability Insurance benefits

under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401-434, §§ 1381-

1383f, respectively.  Plaintiff argues that (1) the Administrative Law Judge ("ALJ")

improperly initiated an investigation by the Cooperative Disability Investigations Unit

("CDIU") of the Office of the Inspector General ("OIG") based on alleged comments by

an unnamed security guard; (2) the ALJ's denial of Plaintiff's request for a supplemental

hearing violated the Social Security Administration's Hearings, Appeals, and Litigation

Law Manual ("HALLEX")[2] and Plaintiff's due process rights; and (3) the ALJ's finding

---

[1]    The parties have consented  to the exercise of authority by the undersigned United
States Magistrate Judge under 28 U.S.C. § 636(c).

[2]    HALLEX provides procedural guidance for processing and adjudicating claims
(continued...)

that Plaintiff was not disabled was not supported by substantial evidence in the record, in that the ALJ improperly disregarded the opinion of Plaintiff's primary care physician (Bruce Berwald, M.D.). For the reasons set forth below, the decision of the Commissioner shall be reversed due to procedural irregularities, and the case shall be remanded to the Commissioner for further proceedings.

## PROCEDURAL HISTORY

Plaintiff, who was born on August 29, 1966, filed for disability benefits on April 5, 2004, at the age of 37, claiming a disability onset date of August 6, 2003, due to injuries to his left shoulder, back, and left leg. After his application was denied at the initial administrative level, Plaintiff requested a hearing before an ALJ, and such a hearing was held on December 16, 2004. At the hearing, Plaintiff testified that he no longer drove and that he could not walk far without a cane, which had not been prescribed for him but which he got from his grandmother.

The next day, on December 17, 2004, the ALJ requested an investigation by the CDIU, after a security guard at the building where the hearing was held reported that he had observed Plaintiff drive into the parking lot, get out of his vehicle, retrieve a cane from the back of the vehicle, and walk with no problems until he got to "the hearing office," at which time Plaintiff began hobbling, using the cane, and acting as if he were in

---

[2](...continued)
at the hearing and Appeals Council levels.

2

great pain.  The security guard had further reported that after the hearing was over, he observed Plaintiff drive away.

The CDIU issued a report on January 20, 2005.  The report documents that on January 13, 2005, CDIU officers witnessed Plaintiff driving, taking out trash at his home, and walking on snow-covered sidewalks without trouble.  The report states that an officer interviewed Plaintiff in Plaintiff's home on January 20, 2005.  Plaintiff stated that he did not have a cane in his home, that the cane was at his grandmother's home, and that if he had insurance he would have his own.  The CDIU report references a videotape of Plaintiff, as an exhibit.  In the report, a CDIU officer stated that at no time while he had observed Plaintiff, both going to the store and during the interview, did it appear that Plaintiff was having trouble standing or walking.  Id. at 93-100.

The record includes a hand-written note signed by Plaintiff dated January 20, 2005, in which Plaintiff wrote that an officer knocked on his door at about 2:30 p.m. on that day, asked him where his cane was, whether the white truck in front of his home was his, and whether Plaintiff lived alone.  According to the note, Plaintiff answered that he lived by himself, that his girlfriend visited on weekends, that the truck was in his aunt's and his own name, and that the cane he used was his grandmother's.  Plaintiff noted that the officer told him to start looking for a job.  Id. at 31.

On January 26, 2005, Plaintiff's attorney requested a copy of the tape recording made at the hearing.  Id. at 52.  On March 21, 2005, Plaintiff's attorney sent a letter to the

ALJ, stating that Plaintiff was attempting to return to work, and that a new Work Activity Report would be added to the file.

Also on March 21, 2005, the ALJ sent a letter to Plaintiff's attorney about the CDIU report. The ALJ enclosed a copy of the report and informed counsel that she (the ALJ) proposed to enter the report into the record. The letter informed counsel that he had the right to submit written comments, additional records, and written questions to the author(s) of the report. Counsel was informed that in addition, he could request a supplemental hearing, at which Plaintiff would have the opportunity to testify and produce witnesses, and that if a supplemental hearing were requested, the request would be granted, unless the ALJ received additional records that supported a fully favorable decision. Further, counsel was told that he could request an opportunity to question witnesses, including the author(s) of the CDIU report, a request which would be granted if the ALJ determined "that questioning the witness is needed to inquire fully into the issues." Plaintiff's counsel was told that he had ten days from the date of receipt of the ALJ's letter to make any of the above submissions or requests. Id. at 46-47.

On March 22, 2005, Plaintiff's attorney sent a letter to the ALJ requesting a supplemental hearing. Id. at 45. By letter dated March 24, 2005, the ALJ denied the request for a supplemental hearing. The letter in full stated as follows: "Regarding your request for a supplemental hearing, I have all the information necessary to render a fair and impartial decision. If you would like to submit a concise brief addressing pertinent issues that are relevant to your client's claim, I will leave the record open for 10 days."

4

Id. at 44.

In response, on April 1, 2005, Plaintiff's attorney faxed a request for additional time to submit "additional evidence."  Counsel stated that he would be on vacation until April 4, 2005, requested that the file stay open up to and including April 14, 2005, and asked the ALJ to advise him if this request were granted.  Id. at 42-43.  The Office of Hearings and Appeals ("OHA") receipt-stamped this fax the same day.  Id. at 42.  The record suggests that the ALJ never ruled on the request, and that Plaintiff did not submit additional evidence or a brief by April 21, 2005, the date on which the ALJ issued her decision denying Plaintiff's application for disability benefits.

In her decision denying benefits, the ALJ found that Plaintiff's allegations of disability were not credible, nor consistent with the record as a whole.  She specifically referenced the CDIU report in her evaluation of Plaintiff's credibility.  The ALJ concluded that Plaintiff could not perform his past relevant work, but retained the residual functioning capacity ("RFC") to perform a full range of light work, reduced by an inability to use his left arm for overhead work.  Applying the Commissioner's Medical-Vocational Guidelines, 20 C.F.R. § 404, Subpt. P, App. 2 ("Guidelines") (Rule 202.18), she found that Plaintiff was not disabled.  Id. at 21-30.

On April 28, 2005, Plaintiff's attorney wrote to the ALJ, requesting that she vacate the unfavorable decision.  Counsel referenced the April 1, 2005 request for an extension of time to obtain additional information from Plaintiff, and the request for a supplemental hearing to which counsel claimed Plaintiff was entitled pursuant to HALLEX 1-2-7-

30(H).[3]  Plaintiff's attorney objected to the ALJ's reliance on the CDIU report to deny

Plaintiff's claim when Plaintiff's attorney had not been allowed to cross examine the

author of the CDIU report nor given the opportunity to view the videotape made of his

client.  The April 28, 2005 letter also objected to the ALJ's use of the OIG to investigate

Plaintiff "in this manner."  Id. at 16.  Plaintiff's attorney noted that he was forwarding a

copy of this letter to the Hearing Office's Chief ALJ and the acting Regional Office Chief

ALJ.  As noted above, on June 14, 2005, Plaintiff filed a request for review of the ALJ's

decision.  Id. at 15.  Both the request for review and the April 28, 2005 letter are receipt-

stamped June 14, 2005.

By letter dated September 19, 2005, the Appeals Council notified Plaintiff's

attorney that any new evidence that would be material to the issues considered in the

hearing decision, or a statement of facts and law, could be submitted within 25 days.  The

letter noted that the Appeals Council was enclosing copies of exhibits, per request.  It is

not clear which exhibits were enclosed.  Id. at 13-14.  The Record indicates that on

October 14, 2005, Plaintiff's attorney faxed a letter to the Appeals Council claiming that

---

[3]     HALLEX I-2-7-1 provides that when an ALJ proposes to admit post-hearing
evidence into the record, the ALJ "must proffer the evidence, i.e., give the claimant and
representative the opportunity to examine the evidence and comment on, object to, or refute
the evidence by submitting other evidence, requesting a supplemental hearing, or if required
for a full and true disclosure of facts, cross-examining the author(s) of the evidence."  1993
WL 643048 (Sept. 2, 2005).

HALLEX I-2-7-30(H) provides: "If the claimant requests a supplemental hearing, the
ALJ must grant the request, unless the ALJ receives additional documentary evidence that
supports a fully favorable decision."  Id.

the ALJ had abused her discretion by using the OIG to investigate Plaintiff, by denying Plaintiff's right to cross examine the authors of the investigative report, and by denying a supplemental hearing. The letter referenced the correspondence between the ALJ and Plaintiff's counsel from March 21, 22, 24, and April 1, 2005; the CDIU report; and a letter from Dr. Berwald dated September 8, 2004, discussed below; and "evidence that follows this letter." The Appeals Council was asked to reverse the decision of the ALJ and find Plaintiff disabled as of his alleged onset date, or in the alternative, remand the case to the ALJ for a supplemental hearing. Id. at 238-39. It is not clear what evidence was being referenced as following the letter, or if such evidence was ever sent.

Approximately one year later, by notice dated September 12, 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. In the notice, the Appeals Council stated that it had considered "[Plaintiff's] contentions raised in [Plaintiff's] request for review received June 14, 2005," but that Plaintiff's "contentions did not provide a basis for changing the [ALJ's] decision." Id. at 10.

By letter dated October 2, 2006, to the Appeals Council, Plaintiff stated that it appeared that the Appeals Council did not consider all the evidence sent on October 14, 2005, "(copy follows)." Plaintiff asked that the September 12, 2006 decision of the Appeals Council be vacated and for an extension of time to file a civil action. Id. at 241. On February 14, 2007, Plaintiff's attorney faxed a letter to the Appeals Council asking to be advised of the status of his October 2, 2006 request. Id. at 240.

On March 5, 2007, a Hearings and Appeals Analyst wrote to Plaintiff's attorney stating that prior to the letter of February 14, 2007, the Appeals Council had had no record of the "contentions that were presumably submitted October 14, 2005." Id. at 8. On March 21, 2007, the Appeals Council set aside its action of September 12, 2006 to consider "the contentions that were raised" in Plaintiff's letter dated October 14, 2005. The Appeals Council stated that, after considering "the additional information," it found no reason to review the ALJ's decision. The Council noted that the ALJ had proffered the investigative report to Plaintiff on March 21, 2005, and that Plaintiff was given the opportunity to comment on the evidence, but that Plaintiff did not do so. Id. at 3-6.

The Council noted further that Plaintiff had requested additional time to submit additional evidence up to April 14, 2005, but that no additional evidence was submitted prior to the date of the ALJ's decision on April 21, 2005. The Council then stated that the ALJ considered all the evidence of record in concluding that Plaintiff was not disabled. The Council also stated that records reflected earnings of $18,598.40 and $42,785 in 2005 and 2006, respectively, indicating that Plaintiff was currently working.[4] Id. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision of April 21, 2005, stands as the final agency action now under review.

---

[4] Evidence of earnings subsequent to the ALJ's April 21, 2005 decision, has not been included in the record provided to the Court; nor do the briefs before the Court mention these earnings.

**Work History**

Plaintiff worked as a pizza cook from January 1993 through May 1996,[5] unloading boxes as heavy as 50 pounds, cutting meat, preparing pizza, and working ovens. Id. at 136. He worked in shipping and receiving for two separate companies from October 2000 to January 2004, loading and unloading boxes. Id. at 104. Plaintiff's earnings records show that he worked for a short period in 1990, that he earned approximately $8,000 per year from 1994 to 2000, and that he earned approximately $20,000 per year from 2000 to 2003. Id. at 79.

After an injury to his left shoulder at work in August 2003 (Plaintiff's alleged disability onset date), Plaintiff signed a settlement agreement with his employer, stating that Plaintiff was entitled to workers' compensation, and would be paid temporary disability for 14 weeks and an additional lump sum of $25,000. Id. at 101. The record shows that Plaintiff filed for unemployment benefits in the second and third quarters of 2004. Id. at 72.

---

[5]    In his Work History Report submitted on April 20, 2004, Plaintiff reported working preparing pizza from January 1993 through May 1995. Id. at 131. In a Work Background form submitted on June 15, 2004, Plaintiff reported working for that same employer from January 1993 through January 1996. Id. at 104. Earnings records show earnings in each quarter from 1993 through 1996. Id. at 81.

9

**Medical Record**[6]

Records indicate Plaintiff received chiropractic treatment for his lower back after a motor vehicle accident in 2000. Id. at 193. On August 8, 2003, Plaintiff visited his primary care physician, Bruce Berwald, M.D., complaining of a work injury two days prior. Dr. Berwald wrote that Plaintiff injured his left shoulder while stacking boxes, was having trouble getting out of bed, and was experiencing worsening pain. Dr. Berwald prescribed Naproxen for pain. Id. at 161.

On August 11, 2003, Plaintiff was examined by Andrea Tobiasz, R.N., and/or H. B. Rogers, M.D., at an occupational health clinic.[7] Plaintiff reported his August 6, 2003 work accident. Plaintiff, who was still working, complained of pain in his low back and left shoulder, and numbness or tingling at times in his fingers. He stated that the pain was worse in the morning, and decreased during the day. Nurse Tobiasz observed normal gait, and pain during a range of motion evaluation in the lower back and left shoulder. An x-ray showed no acute bone change and mild degenerative changes. Nurse Tobiasz prescribed Naproxen, Skelaxin (for muscle spasms), and Salicylate (an anti-inflammatory cream). Plaintiff was directed to apply warm compresses, perform range-of-motion

---

[6]     Although the Court believes that this case must be reversed and remanded on procedural grounds, a review of the medical record is necessary for a full evaluation of the procedural issues.

[7]  This and other medical reports in the record from this clinic list two individuals as the examining physician and are not signed by either one. For each report, the Court will name the two examiners and, thereafter, will refer to the first name listed as the author in each of these reports.

exercises at home, and frequently change positions, and was returned work-restricted to no overhead use of the left shoulder and arm, no lifting over 15 pounds, and limited repetitive bending and twisting. Nurse Tobiasz recommended conservative management and rehabilitative therapy for three visits, and expected no permanent impairment. Id. at 193-96.

On August 18 and 25, 2003, Ateeq Rehman, M.D., and/or J. Arekapudi, M.D., examined Plaintiff. Plaintiff reported that he felt better, although he had continued pain in his left shoulder. He was prescribed Methylprednisolone (an anti-inflammatory), Naproxen, and Skelaxin, instructed to do home exercises and use warm compresses and continue therapy. At the August 25 visit, Plaintiff was returned to work without restrictions. Id. at 197-99, 200-01.

On September 2, 2003, Plaintiff was examined by Nurse Practitioner Kathleen LoBello, and/or C. F. Clark, M.D. Plaintiff was working full duty without difficulty. Plaintiff stated that his shoulder was stiff in the mornings, that he was taking Naproxen during the day and Skelaxin at night which helped for shoulder pain, and that he had completed a course of Medrol (Methylprednisolone). Nurse LoBello observed full range of motion in Plaintiff's back and left shoulder. She prescribed Naproxen, suggested that Plaintiff continue home therapy, and planned continued conservative management. Id. at 202-03.

On December 10, 2003, Plaintiff was examined again by Nurse Aubuchon and/or Dr. Rogers. Plaintiff was working without restrictions, but had noticed increased pain a

few weeks earlier, with lifting exacerbating the pain in his left shoulder. Plaintiff stated that he was not taking medication because he did not have any. He reported being left handed and experiencing numbness and tingling in his left hand with overhead reaching. Plaintiff was using a pulley for home exercises given to him by the clinic. His lower back hurt and was stiff in the mornings, but activity helped as the day progressed. Nurse Aubuchon observed that Plaintiff was in no immediate distress, had full weight bearing gait and no limp, but had pain with range-of-motion tests in his lower back and left shoulder and some numbness in his left hand fingers. She prescribed Methylprednisolone, Naproxen, Tramadol, and warm compresses, and suggested one week of physical therapy in three sessions. Nurse Aubuchon suggested no overhead use of the shoulder, no lifting over ten pounds, and limited repetitive bending and twisting, and no pushing and pulling over 15 pounds. Id. at 204-07.

On December 12, 2003, Plaintiff reported to his physical therapist that he had sharp pains in his left shoulder when reaching, numbness and tingling in his left fingertips, and pain of six on a scale of ten which increased with working and decreased with ice and medication. Plaintiff reported stiffness in his lower back; pain and tingling in his back thighs, which increased with bending; and pain of four on a scale of ten, which decreased with heat and treatment. His therapist observed that Plaintiff tolerated treatment well. She noted decreased range of motion, decreased functional status, and decreased strength. She planned ongoing range-of-motion therapy and suggested starting strength exercises the next session. Id. at 208-09.

On December 15, 2003, Plaintiff reported to his physical therapist that his lower back felt better. The therapist observed that Plaintiff's "gait and movements [were] less guarded," that Plaintiff tolerated exercises well, and that pain had decreased in Plaintiff's back and shoulder, with increased mobility. She planned continued range-of-motion therapy and strengthening. Id. at 210-11.

On December 17, 2003, physical therapist Laura Wisa saw Plaintiff and wrote a note about discontinuing therapy "due to patient reporting nothing is helping and [being] uncooperative." She reported that Plaintiff "swung" at her during therapy and was "not cooperative with reevaluation." She reported that she was unable to reassess Plaintiff's shoulder range of motion "due to [his] irritated attitude." Ms. Wisa reported that Plaintiff had requested an MRI, stating, "something is wrong in there," and that he reported sharp pain in his anterior shoulder and that his fingers and hands were going numb. Ms. Wisa felt that rehabilitative potential was still good. Id. at 216-17.

On that same day, Plaintiff was again examined by Nurse Aubuchon and/or Dr. Rogers. Plaintiff stated that his back was better but that he was still having a lot of pain in his left shoulder even with three physical therapy sessions, that medication only helped "for a short time," that his left shoulder woke him up every hour at night, and that he was doing home exercises as recommended. Plaintiff was working with the restrictions imposed by Nurse Aubuchon on December 10, 2003. She prescribed Cyclobenzaprine (a muscle relaxant), Naproxen, and Tramadol, and recommended an MRI to determine possible internal derangement. Id. at 212-14.

An MRI taken on December 26, 2003, revealed an intrasubstance tear of supraspinatus muscle evidenced by abnormal fluid collection. Plaintiff stated that his back was much better (80-85% better than initial injury). Nurse LoBello noted that Plaintiff was "working light duty without difficulty," and suggested that Plaintiff return to work with the same restrictions. She referred Plaintiff to specialist Mitchell Rotman at an orthopedic center, with an appointment scheduled for January 13, 2004. Id. at 219-221.

On January 24, 2004, Dr. Berwald noted that Plaintiff had been receiving workers' compensation, and was not happy with his care. Plaintiff had received care at another facility, including a cortisone injection which had not helped, and was experiencing stiffening in the mornings. Dr. Berwald agreed with an orthopedic specialist's plan for steroid injections.[8] On March 4, 2004, Dr. Berwald wrote that Plaintiff was "at full shifts at work for over a month," that "pain [was] severe in left shoulder," and that work made it worse. Dr. Berwald wrote, "failed conservative management - seems to me he needs more definitive treatment with surgery," adding that records were unavailable to him. He prescribed Vicodin. Id. at 160.

On March 16, 2004, Dr. Berwald noted that Plaintiff had been off work from March 4 through March 10, and that Plaintiff's orthopedic specialist had recommended that Plaintiff could return to full duty at work, but that his employer sent Plaintiff home. Dr. Berwald wrote that he still felt that Plaintiff was "unable to work in a warehouse at

---

[8]  There is no independent documentation of these steroid injections.

physical labor." He noted that Plaintiff said that there was no light duty available, and he wrote "will leave off work until definitive treatment done." Id. at 159.

On March 19, 2004, Plaintiff presented to the occupational health clinic. Plaintiff was still working. Examining physician, J. Arekapudi, M.D., diagnosed resolved lumbar strain, strain to the anterior left shoulder, and internal derangement of the left shoulder. The physician's notes state,

> Patient was sent to Dr. Rotman who gave him a steroid injection per patient which did not work. Surgery was to be schedule[d] but because of the way patient was behaving in Dr. Rotman's office-he was discharged from care. Patient is here complaining of severe left shoulder pain and inability to sleep through the night secondary to pain. Feels he should be off work. States he is frustrated because he is putting up with this for the last 8 months. Patient uses bad language!

Dr. Arekapudi observed that left shoulder abduction and flexion was not possible beyond 90 degrees. He prescribed Cyclobenzaprine and Tramadol. He indicated that Plaintiff appeared "normal" and in "no immediate or obvious distress," opined that Plaintiff could perform "light duty," and referred Plaintiff for treatment by an orthopedic specialist, David A. Anderson, M.D. Id. at 222-26.

On March 22, 2004, Plaintiff presented to Dr. Anderson for an initial workers' compensation visit. Dr. Anderson reviewed Plaintiff's December 26, 2003 MRI showing abnormal fluid collection in the muscle. Dr. Anderson did not guarantee that an arthroscopic procedure would necessarily alleviate all shoulder discomfort. Plaintiff indicated a desire to proceed with surgery. Dr. Anderson recommended continuing work without lifting above shoulder height. Id. at 186-87.

15

On April 6, 2004, Plaintiff underwent arthroscopic surgery with Dr. Anderson to repair his left shoulder rotator cuff.  Id. at 185-89.  On April 14, 2004, Dr. Anderson wrote that Plaintiff should work on range of motion and strengthening exercises and progress to general conditioning exercises.  He asked Plaintiff to return in three weeks, hoping to return Plaintiff "to some of his work activities at that point in time."  Id. at 146.

On April 15, 2004, physical therapist Justin Beebe evaluated Plaintiff.  He wrote that prior to the accident, Plaintiff had played basketball, football, and baseball, that Plaintiff was currently out of work, and that Plaintiff presented with decreased range of motion and wanted to decrease his pain during activities of daily living.  They began a plan for three weeks of therapy.  Mr. Beebe wrote that Plaintiff was able to drive, using his right hand primarily, and that Plaintiff's girlfriend helped with household chores.  Id. at 178-183.

On April 16, 2004, Plaintiff reported to Mr. Beebe that pain woke him every one or two hours from sleep, that he was taking pain pills three times per day, and that he hoped to decrease pain during activities of daily living.  Id. at 176-77.  On April 19, 2004, Plaintiff reported difficulty sleeping, inability to play sports he formerly played, inability to reach overhead and lift 20-25 lbs, and that pain was, at its worst, an eight or nine out of ten.  Mr. Beebe wrote, "Patient will continue to benefit from skilled PT to decrease pain, increase range of motion, and strength in the left shoulder."  Id. at 174-75.

On April 21, 2004, Dr. Anderson observed fair motion and that the surgical wounds had healed well.  Dr. Anderson recommended continued therapy and prescribed

Ambien, noting that Plaintiff remained disabled from work.  Id. at 146.  On April 22, 2004 and April 23, 2004, Plaintiff reported to Mr. Beebe that he had been handcuffed by police that week and that pain had gotten worse since surgery.  Plaintiff experienced no pain at rest, but had pain with "jerky" movements.  Mr. Beebe suggested discontinuing home exercises until pain decreased, and planned future therapy to stabilize the shoulder and increase tolerance to motion.  Id. at 165-73.

On April 26, 2004, Mr. Beebe observed that Plaintiff continued to have significant pain, that physical therapy progression was limited by Plaintiff's pain, and noted that Plaintiff planned to visit his doctor regarding pain since having his arms pinned behind his back in the incident with police the week prior.  Plaintiff had difficulty sleeping, found sleeping pills helped, but found pain pills did not help, and that he would wake at night from pain.  Id. at 163-64.

On April 28, 2004, Plaintiff returned to Dr. Anderson at the request of his insurance carrier.  Plaintiff complained that police officers handcuffed his arms behind his back, aggravating his shoulder, in the altercation the week prior.  Plaintiff stated that his arm was sore, but that he was unaware of any strength deficit.  Dr. Anderson observed flexion to 150 degrees and ability to support against resistance.  He noted that Plaintiff had "good strength of external rotation against resistance," and no snapping during maneuvers.  Dr. Anderson told Plaintiff that he did not feel that Plaintiff "had sustained any significant intervening injuries."  He recommended ongoing physical therapy in a strengthening program.  Id. at 146.  On May 5, 2004, Dr. Anderson wrote that physical

therapists recommended continuation of therapy for strengthening. He observed "fairly good motion with forward flexion of 170 degrees . . . [and] good strength of muscle groups." Dr. Anderson recommended continued therapy and work restrictions to ten pounds not above shoulder height, remarking that he was "hopeful of increasing work activities." Id. at 145. On May 20, 2004, Plaintiff reported to Dr. Anderson that he was still feeling persistent pain in his shoulder, and that he did not feel substantial improvement, complaining of discomfort when lifting. Plaintiff stated that he had attempted to return to work, assigned to light duties, but had been sent home "because he was having trouble tolerating those activities."

On June 10, 2004, Dr. Anderson wrote that Plaintiff "really [had] not made a lot of progress as far as his strength," and had been limited by his continued complaints of pain. Dr. Anderson noted that a work-hardening therapist had informed Plaintiff of different work-hardening facilities and that Plaintiff was interested in pursuing such treatment. Plaintiff did not feel "he was really pushed in his last program." Dr. Anderson suggested no lifting more than ten pounds above chest level, and that a permanent decision regarding work activities should be made in two weeks. Id. at 144.

On June 20, 2004, Dr. Anderson wrote that "progress has been limited by [Plaintiff's] subjective complaints." He wrote that his goal was to try and condition Plaintiff's left shoulder to the point that Plaintiff could return to work activities, and recommended continued restrictions of no lifting in excess of ten pounds, and continuation of work conditioning. Id. at 144. On June 21, 2004, physical therapist

Patience Westfall documented that Plaintiff had been placed on light duty with his employer, but that his employer had not contacted Plaintiff to begin and Plaintiff had not yet returned to work. Ms. Westfall reported Plaintiff's complaints of ongoing pain in the left shoulder, interference with sleep, and stiffening. Ms. Westfall opined that Plaintiff "self limits during activities due to pain." She observed that Plaintiff was very guarded during exercises, and had not met range of motion, upper extremity muscle testing, nor grip and pinch muscle testing goals. Id. at 151-52.

On June 23, 2004, physical therapist Eric Kuschel submitted a report to Dr. Anderson that Plaintiff had attended six out of six half-day sessions since the initial evaluation, that Plaintiff rated his pain at a seven before and after activity; that pain, strength, endurance, and flexibility had not improved significantly; and that Plaintiff did not feel ready to return to work. Plaintiff complained of left shoulder pain, weakness, and back pain. Mr. Kuschel reported that Plaintiff was lifting at a medium work level with an ability to lift 46 pounds from the floor to the height of his knuckles, 22 pounds from that point to his shoulders, and 15 pounds from that point to over his head. He could carry 26 pounds walking 20 feet. He noted that Plaintiff's warehouse job demanded a heavier physical demand level than Plaintiff could currently handle. Plaintiff could tolerate sitting, standing, walking, climbing stairs, overhead reaching, squatting, stooping, crouching, trunk twisting, forward reaching, pushing and pulling, and handling. Therapists noted only one area where Plaintiff's tolerance was inadequate, namely, trunk bending. Mr. Kuschel opined that Plaintiff was performing well until June 22, 2004, at

which point Plaintiff complained of low back pain. He observed particular difficulty lifting from waist to shoulder and overhead, because of shoulder pain. He recommended performing a baseline functional capacity evaluation, and noted that Plaintiff was making slow progress overall. Id. at 148-49.

On June 24, 2004, Dr. Anderson noted that Plaintiff had been asked to do some job-hardening activities, but that shoulder symptoms prohibited progress, that pushing and pulling exercises exacerbated Plaintiff's symptoms, and that Plaintiff was "resigned to the fact that he [could] not return to his former employment." Dr. Anderson observed that Plaintiff showed forward flexion of the shoulder to 170 degrees and good strength. Dr. Anderson told Plaintiff that he did not have further studies or invasive procedures to perform, and that his "only recommendation . . . would be to place permanent restrictions on [Plaintiff's] activities," with "no work above shoulder height," and "lifting and carrying of 40 lbs." Dr. Anderson opined that Plaintiff "is at a state of maximum medical improvement regarding his prior shoulder injury" and discharged Plaintiff from his care. Id. at 143.

On July 29, 2004, Dr. Berwald wrote that Plaintiff had undergone rotator cuff repair surgery, but that Plaintiff reported pain still present, and that pain worsened with lifting. Dr. Berwald indicated that Plaintiff still had significant rotator cuff and low back pain, but was cut off pain medications. Dr. Berwald planned to review the records from other physicians. Id. at 159. On September 3, 2004, Dr. Berwald indicated that Plaintiff complained of leg pain getting worse, with difficulty standing more than one half hour,

pain increasing when walking or climbing stairs.  Dr. Berwald diagnosed left shin region pain due to a past treatment, worsening with age.  Id. at 158.

On September 8, 2004, Dr. Berwald completed a questionnaire about Plaintiff's impairments.  Dr. Berwald reported diagnoses of a left rotator cuff tear, chronic low back pain, and a left tibial fracture, and a prognosis of "poor."  He identified Plaintiff's symptoms as weakness, unstable walking, numbness or tingling, increased muscle tension, and pain.  Dr. Berwald opined that Plaintiff could not sit at one time for more than two hours; could not stand at one time for more that 30 minutes; could stand/walk for a total of about two hours and sit for a total of about four hours in an eight hour workday (with normal breaks), and would need a job that would allow shifting of positions at will and unscheduled breaks during an eight hour workday.  Dr. Berwald indicated that Plaintiff did not need a cane or other assistive device; could frequently lift items of less than ten pounds, occasionally lift items of ten pounds, rarely lift items of 20 pounds, never lift items of 50 pounds, and rarely twist, stoop, bend, crouch, climb ladders, and climb stairs.  Dr. Berwald opined that emotional factors did not contribute to the severity of Plaintiff's symptoms and limitations, and that Plaintiff often experienced pain that interfered with attention and concentration.  Dr. Berwald concluded that Plaintiff's impairment was likely to produce good days and bad days and that his impairment would likely cause work absences more than three times per month, "depend[ing] on work level."  Id. at 154-55.

## Evidentiary Hearing of December 16, 2004

At the evidentiary hearing, Plaintiff testified that he lived alone in an apartment, and that three of his six children visited him every weekend, staying overnight Friday through Sunday. The children were three, five, and nine years old. Plaintiff completed school through the 11th grade and attended truck driving school, but did not attend any vocational rehabilitation. Plaintiff testified that he had experience as a cook, and in shipping and receiving. He worked approximately four years at his last job in warehouses, which had been the longest he had stayed at one job. Plaintiff lifted up to 100 pounds in shipping and receiving, and up to 20 or 30 pounds as a cook. Id. at 249-51.

Plaintiff testified that he was not currently looking for a job, stating that no one would want to hire him under the restrictions imposed by Dr. Anderson. Plaintiff was not doing any volunteer work. He babysat for his three-year old son from time to time during the week. Plaintiff testified that he received worker's compensation and that unemployment payments would run out at the end of the month. Plaintiff did not recall signing a statement in his unemployment compensation application that he was "ready, willing, and able to work," explaining that he did not sign anything because he applied over the phone. Id. at 251-52.

Plaintiff testified that his left shoulder, left leg, and lower back injuries prevented him from working, and that his doctor released him from care "on permanent disability with no lifting 40 pounds above [his] chest." Because of his leg problems, Plaintiff could

only stand 20 to 25 minutes at a time; because of his back pain, he could only sit for two hours at a time. Plaintiff stated that his doctor told him that he should not lift anything over 40 pounds above his chest, but that lifting in general bothered him. He complained, "I can't really lift nothing hardly at all." Plaintiff stated that treatment had focused on his left shoulder. He had gotten some therapy for his lower back, but because he was not currently employed and insured, he had not been able to get more treatment. He claimed that because of his back pain, he could not "really bend." When asked by the ALJ if he had complained about his lower back to his physicians, Plaintiff responded that he had and that his primary care physician responded more to those complaints than other treating physicians, prescribing sleeping and pain pills. Id. at 252-55.

Plaintiff stated that he was no longer able to receive treatment because he had no insurance. He testified that he was taking muscle relaxants, pain pills, and sleeping pills prescribed by Dr. Berwald, but that they were not working. Plaintiff stated that he last saw Dr. Berwald on September 3, 2004, and that Dr. Berwald was treating him for his leg, back, and shoulder. When the ALJ asked why he would take medications if they were not working, Plaintiff responded that he stopped taking them about a week ago and was currently not taking any medication. Id. at 255-57.

Plaintiff described a typical day as getting up at about 9:00 or 10:00 in the morning, washing his face, brushing his teeth, watching TV, and reading the paper. A family member would come to Plaintiff's home to prepare meals. Plaintiff did not do his own shopping, housecleaning, or laundry, or have a computer, and spent part of the day

reading.  Plaintiff testified that he did not sleep well, and often fell asleep while watching TV sitting up on his couch, at about 2:00 or 3:00 in the morning.  Id. at 257-58.

Plaintiff testified that he had a pin and plate in his left leg, that he could only stand for about 30 minutes before having to sit down, and that he could only sit for about two hours before he would need to get up and move around.  He stated that he did not cook because he did not know how to cook.  Plaintiff could lift a gallon of milk; but he was learning to do everything with his right hand, as he was left handed.  Plaintiff stated that he could not walk "that" far without a cane, adding that he mostly stayed on the first floor of his two level townhouse.  Plaintiff was not prescribed a cane, but got one from his grandmother.  Plaintiff testified that he went to church on Sundays, and that he had a car but had given it to his girlfriend and did not drive it anymore.  Id. at 258-60.

In response to questioning by his attorney, Plaintiff testified that the work restrictions imposed by Dr. Anderson only pertained to treatment of Plaintiff's left shoulder.  Plaintiff testified that his injury to his left leg occurred when he was hit by a car about 25 years ago, and that his leg had started to hurt him again as he got older. Plaintiff acknowledged that when he filed his application for disability benefits, he did not tell the claims representative anything about his leg.  Plaintiff stated that he did not take his sleeping pills because he found they did not help him.  He used a cane because his left leg gave out on him when he walked or stood for a "length of time."  Plaintiff testified that his left leg bothered him when the weather changed and when he went up and down steps, and that sometimes he had "a real sharp pain."  Id. at 261-263.

Plaintiff described the pain in his lower back as pins and needles, stating that when he was initially injured in August 2003, he had therapy for about a month and that his request for more treatment was denied by workers' compensation.  Id. at 264-65.

Plaintiff testified that Dr. Berwald had been his doctor for a few years and was familiar with his problems, and that he (Plaintiff) did not pay and was not charged by Dr. Berwald for his care.  He described getting tired during the day, needing to "take a nap or something," but then being unable to lay down, so he would sit up all day.  Id. at 265.

**ALJ's Decision of April 21, 2005**

The ALJ found that Plaintiff had a severe combination of impairments but that they did not meet or medically equal the severity of any deemed-disabling impairment listed in the Commissioner's regulations, 20 C.F.R. § 404, Subpt. P, App. 1.  The ALJ proceeded to consider whether Plaintiff had the RFC to perform his past relevant work or other work which existed in the national economy.  The ALJ noted that Plaintiff's subjective complaints were to be considered based on the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984).  In assessing Plaintiff's credibility, the ALJ found that observations by Plaintiff's treating sources were inconsistent with Plaintiff's allegations of severe disabling pain and dysfunction.  The ALJ cited medical notes stating that Plaintiff did not appear in immediate distress and, on one occasion (when he initiated treatment with Dr. Anderson on March 22, 2004), that he appeared comfortable.

The ALJ then discussed the CDIU report.  Noting that Plaintiff's treatment records also stated that Plaintiff could drive, the ALJ stated that Plaintiff "did not tell the truth" at the hearing, and that the facts noted in the CDIU report reflected "very disfavorably" on the credibility of Plaintiff's allegations of disability.  The ALJ also next stated that, while receipt of unemployment benefits did not preclude the receipt of disability benefits, a claimant's representation that he was ready, willing, and able to work, in order to qualify for unemployment benefits was inconsistent with allegations of disability.  The ALJ then summarized the objective medical evidence and noted that Plaintiff was not receiving any treatment or taking any prescribed medication for any of his impairments.  The ALJ stated that this was a basis for discounting Plaintiff's subjective complaints of disability.  Determining that Plaintiff did not show that he had ever been denied treatment because of an inability to pay, the ALJ discounted Plaintiff's complaint that he could not afford continued treatment.

The ALJ determined that, "[o]verall" the physician-imposed functional limitations indicated that Plaintiff was capable of performing, at a minimum, light work with no overhead work with his left arm.  The ALJ afforded "very little weight" to Dr. Berwald's September 8, 2004 opinion which suggested that Plaintiff's capacity was more limited.  She reasoned that Dr. Berwald provided relative little treatment compared to Dr. Anderson, an orthopedic specialist, and that Dr. Berwald's opinion appeared to be based upon Plaintiff's subjective complaints rather than on abnormal medical signs and laboratory findings.  The ALJ determined that Plaintiff could not perform his past

relevant work, and that application of the Guidelines directed a finding of not disabled. The ALJ stated that application of the Guidelines was appropriate because Plaintiff's inability to use his left arm for overhead work did not significantly restrict his ability to perform the full range of light work.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not

less than 12 months.  42 U.S.C. § 423(d)(1)(A).  Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  Id. § 423 (d)(2)(A).  Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months.  Barnhart v. Walton,  535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability.  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I.  If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any, as he actually performed it, or as generally required by employers in the national economy.  If the claimant has

past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment.  Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

**Initiation of Investigation**

Plaintiff offers no support for his contention that the ALJ's request for an investigation by the CDIU constituted an abuse of discretion, and the Court concludes that this argument is without merit.  Cf. Price v. Bowen, No. CV 87-238-BLG-JFB, 1990 WL 164785 (D. Mont. May 16, 1990) (upholding termination of disability benefits where ALJ found, based upon an OIG investigation initiated upon the receipt of anonymous information, that the claimant was engaged in substantial gainful activity).  Accordingly,

the Court concludes that initiation of the investigation is not cause to reverse the ALJ's decision that Plaintiff was not disabled.

**Denial of Request for a Supplemental Hearing**

A more difficult question is presented by Plaintiff's argument that the ALJ violated HALLEX I-2-7-30(H), as well as Plaintiff's due process rights, by denying his request for a supplemental hearing.  It is not clear why the ALJ first told Plaintiff that if he requested a supplemental hearing one would be granted, but several days later denied Plaintiff's explicit request for such a hearing.  This denial does indeed appear to have violated HALLEX.  I-2-7-30(H), which, as set forth above, provides that an ALJ who proposes to rely on post-hearing evidence must grant a claimant's request for a supplemental hearing, "unless the ALJ received additional document evidence that supports a fully favorable decision."

Further, the statement in the letter denying Plaintiff's request for a supplemental hearing that Plaintiff could within ten days submit "a concise brief addressing pertinent issues," could have reasonably led Plaintiff to believe that the right to submit written questions to the authors of the CDIU report afforded him by the ALJ in the letter of March 21, 2007, was also revoked as was the right to a hearing upon timely request.  And there is the additional problem that the ALJ denied Plaintiff's application for benefits while his request for an extension of time to supplement the record was still pending.

While the Eighth Circuit has not specifically ruled on the effect of a violation of HALLEX, other Circuits have.  The Ninth Circuit believes that HALLEX is an internal

manual with no legal force.  Moore v. Apfel, 216 F.3d 864, 868-69 (9th Cir. 2000) ("As

HALLEX does not have the force and effect of law, it is not binding on the

Commissioner and we will not review allegations of noncompliance with the manual.")

(citing Schweiker v. Hansen, 450 U.S. 785, 789 (1981) (per curiam) (holding that rules in

claims promulgated for claims representatives do not bind the Social Security

Administration)).  The Fifth Circuit held in Newton v. Apfel, 209 F.3d 448 (5th Cir.

2000), that although HALLEX does not carry the authority of law, "'where the rights of

individuals are affected, an agency must follow its own procedures, even where the

internal procedures are more rigorous than otherwise would be required,'" and should

prejudice result from a violation of an agency's internal rules, the result cannot stand.[9]

Id. at 459 (quoting Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. 1981)).

This Court believes that the Eighth Circuit would hold that HALLEX does not

have the force of law.  Cf. Shontos v. Barnhart, 328 F.3d 418, 424 n.7 (8th Cir. 2003)

(the Social Security Administration's Program Operations Manual System (POMS)

guidelines do not have legal force and do not bind the Commissioner; still, an ALJ should

consider them).  But this does not end the matter as Plaintiff also raises a due process

---

[9]    The Court notes that the Commissioner's actual regulations, which do have the
effect of law, do not grant a disability claimant the absolute right to a supplemental hearing
in response to post-hearing evidence.  By way of contrast, the regulations do require that the
agency grant a claimant's request for a supplemental hearing when an ALJ proposes to revise
a decision based upon evidence not included in the record on which the prior decision was
based.  See 20 C.F.R. § 404.929(c).  In Plaintiff's case, however, the ALJ had not yet issued
a decision.

challenge to the procedures followed in this case.  Recently, the Eighth Circuit was faced with a related question in Passmore v. Astrue, 533 F.3d 658 (8th Cir. 2008).  In that case, after the ALJ denied the claimant's application for disability benefits, the Appeals Council remanded the matter to the ALJ for the ALJ to obtain additional evidence, including a consultative orthopedic examination to evaluate the claimant's back impairment.  The ALJ did so, and then conducted a supplemental hearing, but denied the claimant's request to subpoena the orthopedic consultant.  Instead, an orthopedic medical expert testified at the supplemental hearing that based on the entire record, including the new consultative report, the claimant was not disabled.  The ALJ issued a new decision that the claimant was not disabled, and the Appeals Council denied review.

Upon judicial review, the district court concluded that the plaintiff's due process rights were violated when the ALJ denied the plaintiff's subpoena request.  The Eighth Circuit reversed.  The Court recognized that "[p]rocedural due process under the Fifth Amendment requires that [social security] disability claimants be provided a 'full and fair hearing,' but added that '[s]ocial security disability hearings are non-adversarial proceedings and do not require full courtroom procedures.'"  533 F.3d at 663-64 (quoting Hepp v. Astrue, 511 F.3d 798, 804 (8th Cir. 2008)).  The Eighth Court held that in the social security disability context, there existed no absolute due process right to cross-

examine providers of medical reports relied upon by the ALJ, but rather only a qualified regulatory right under 20 C.F.R. § 404.950(d)(1).[10]

The Court held that to determine whether the process afforded a claimant was sufficient under the due process clause, courts must balance

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Id. at 644 (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)).

Applying this balancing test to the facts before it, the Eighth Circuit concluded that the plaintiff's due process rights were not violated by the denial of the right to cross-examine the consultative orthopedist, in light of the substitute procedure employed by the ALJ, namely having an orthopedic medical expert testify at a supplemental hearing and affording the claimant the opportunity to cross-examine that witness. "[Plaintiff] thus had an opportunity to confront the evidence he believed was adverse to his claim." Id.

---

[10]    This section provides as follows:

When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing.

Further, the Eighth Circuit noted that the plaintiff "could have requested or the ALJ could have obtained further clarification from [the consultant]." Id.

In Passmore, the Eighth Circuit discussed with approval a Sixth Circuit case, Flatford v. Chater, 93 F.3d 1296 (6th Cir. 1996), which also held that a Social Security claimant did not have an absolute due process right to cross-examine, and which used the Eldridge balancing test to determine that a claimant's due process rights were not violated by the ALJ's denial of the claimant's request to subpoena and cross-examine a physician whose answers to interrogatories posed by the ALJ had been entered into the record. The Sixth Circuit held that the substitute procedure afforded the claimant, namely to submit further interrogatories to the physician, providing the claimant "a meaningful opportunity to confront the evidence he believe[d] to be adverse to his claim." 93 F.3d at 1306-07.

The Passmore Court then considered whether the ALJ had abused the discretion accorded him by § 404.950(d)(1) in denying the subpoena request. The Court concluded that there had been no abuse of discretion because the plaintiff had not, among other things, indicated why the information he would have sought in his desired cross-examination could not have been obtained through interrogatories, and "failed to establish that his cross-examination of [the examining consultant] was reasonably necessary for the full presentation of his case." Id.

This Court believes that the reasoning and holding of Passmore apply to the present case, even though a post-hearing CDIU report is involved rather than a post-

hearing physician's report. Employing the Eldridge balancing test, however, this Court must conclude that here, unlike in Passmore, Plaintiff's due process rights were violated because the process he was offered as a substitute to a supplemental hearing was inadequate. As noted above, the letter denying Plaintiff's request for a supplemental hearing told Plaintiff that he could submit "a concise brief addressing pertinent issues" within ten days. This falls short of the alternatives to cross-examination made available to the claimants in Passmore and Flatford. Furthermore, while the Court recognizes that Plaintiff's request for an extension of time to supplement the record did not in and of itself stay the time within which Plaintiff was given to respond to the CDIU report, it is troubling that the ALJ issued her final decision on Plaintiff's application for benefits when the request for an extension of time was still pending.[11]

The Court does not believe that the process afforded Plaintiff at the Appeals Council level (i.e., giving Plaintiff 25 days to submit new material evidence or a statement of facts and law) cured the procedural deficiency at the ALJ level. In sum, the Court does not believe it can be said that Plaintiff was provided with a meaningful opportunity to confront the post-hearing CDIU report which was adverse to Plaintiff's claim, and upon which the ALJ relied in part to deny his claim. Nor does the Court believe that it can be said that the error here was harmless. Although the ALJ gave other

---

[11]    Further, it is clear that Plaintiff's counsel requested the hearing within the ten days set by the ALJ, and was thereafter on vacation, and while on vacation, requested additional time to file, which request was never ruled upon.

valid reasons for questioning Plaintiff's credibility, which appear to be well-supported by the record, the ALJ specifically stated that the facts noted in the CDIU report reflected "very disfavorably" on the credibility of Plaintiff's allegations of disability. Because the Court cannot assess the impact of the security guard's statement and the CDIU report upon the ALJ's credibility determination and ultimate decision, the Court cannot conclude that failing to afford Plaintiff a meaningful opportunity to confront this evidence was harmless error.

Accordingly, the Court believes the ALJ's decision must be reversed and that the case must be remanded. On remand, if the CDIU report or the security guard's statement is to serve as a basis for the decision, Plaintiff must be given a meaningful opportunity to address the report. Also on remand, the Appeals Council's statement with reference to Plaintiff's earning in 2005 and 2006 might be explored.

<u>**CONCLUSION**</u>

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** to the Commissioner for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 25th day of September, 2008